ANDREW J. YATES, Appellant, vs. SAM HOUSTON, Appellee —
Appeal from Harris County.

[See same case, 10 Tex. 168.]

Where a court has jurisdiction of the parties and the subject matter, its judg-
ment is reversible only in an appellate court; and cannot be questioned, or
treated as a nullity, in a collateral action. [13 Tex. 68.]

Where parties presented themselves as man and wife in Texas, in 1822; were
registered as such in Austin's colony, where they settled, and were so reputed
to be by the colonists, until the death of the man in 1827; and it subse-
quently appeared that the man had been previously married in 1809, in the
state of Ohio, where a separation took place about the year 1818, between
himself and his wife, and the latter shortly afterwards disappeared, so that
no trace of her existence during the four years preceding the husband's emi-
gration to Texas, as aforesaid, could be discovered or established: *Held*, that
the rational presumption was that his first wife was dead; that there was
no legal impediment to his contracting marriage with the second or reputed
wife; and that such marriage must be presumed to have been actually en-
tered into, notwithstanding the connection between the parties was illicit
and criminal at its commencement. [7 Tex. 178; 18 Tex. 103.]

The grants of land made to married men (colonists) under the colonization
law of 1823 are community property; and, as such, subject to division be-
tween the surviving, and the heirs of the deceased, partner of the marriage.
[6 Tex. 232; 11 Tex. 513.]

The appellee, who was plaintiff in the court below, brought
suit against the appellant on the 13th day of March, 1846, to
try the title to one-half league of land situated in Liberty
county. The venue was, by agreement of the parties, subse-
quently changed to Harris county.

It appears, from the record, that the land in controversy was
the one-half of a league granted, in the year 1824, to one John
Jiams, who, with his family, had emigrated to Texas, and set-
tled in Stephen F. Austin's colony. The said John Jiams died
in the year 1827, leaving two children by his first wife and
three by his second, or reputed wife, Tabitha, who survived
him, and subsequently intermarried with one David Harris.
The title set up by the plaintiff in the court below was derived
from the surviving wife of the said John Jiams, deceased, then
Tabitha Harris, who, together with her husband, David Har-
ris, conveyed the same to the plaintiff on the 2d day of
December, 1827, which conveyance was duly recorded on the
28th of the same month. In support of his title, the plaintiff
also introduced in evidence an authenticated copy from the

28

records of the probate court of Harris county, showing that partition had been duly made of the league of land referred to; and that the one-half thereof, claimed by the plaintiff, had been assigned and set over by said court to the said Tabitha Harris, by whom it was afterwards conveyed to the plaintiff as aforesaid.

The title set up by the defendant was derived subsequently to that of the plaintiff, by conveyances to himself from the mother (the surviving parent) of said John Jiams, deceased, who resided in the state of Ohio; and from Ruth and John Jiams, Jr., the surviving children of said deceased by his first marriage. The facts relative to the separation of the deceased from his first wife, and his subsequent connection with his reputed wife, Tabitha, so far as the same are disclosed by the record, will be found stated in the opinion of the court.

A special verdict was found by the jury, and judgment rendered thereon in favor of the plaintiff, from which the defendant appealed.

A. J. YATES for appellant.

In the argument of this cause in behalf of the appellant, who, by stipulation between the parties, sets up in his defense a title in himself to the land claimed by the appellee, and described by the same metes and bounds as set forth in his petition, the appellant assumes the following preliminary positions, under the act of congress approved 5th February, 1840 [Laws of Texas, vol. 4, p. 137]:

1. The nature and character of the title to the land in question must be determined by the laws in force at the time the grant was made.

2. The inheritance of the estate of John Jiams, senior, must be determined by the laws of descent, distribution and inheritance in force at the time of his decease.

3. The protection and preservation of the rights of the parties, or their legal representatives, subsequent to the time that they accrued, must have been in accordance with the statutes from time to time made, which affected the same.

Upon these bases, the appellant sets up in his defense:

1. That the league of land, of which the appellee claims part, was a *donation* or *gift* from the sovereignty to the husband alone, and therefore was not community property, by virtue of which the appellee claims title in his grantors. [Ben. & Sli. Dig. enlarged, 281; L. Rep. 1 N. S. 99; Heirs of Roquier *vs.* His Executors, id. 324; Gayoso de Lemos *vs.* Garcia, 1 White's Rec. 61, 62; id. 592, 595.]

1st. Because the grant was made by virtue of the decrees of the sovereign constituent congress of Mexico of 11th and 14th April, 1823, and in conformity with the decree of the Mexican government of 18th February, 1823, which is also in accordance with the general colonization law of the same power, of 3d January, 1823; all of which declare the same to be a gift to the head of a family, or to a colonist, and without any consideration, but declaring, with the grant itself, the moving causes of the gift to have been vested in the donee. The constitutive act of the state of Coahuila and Texas is dated 15th August, 1824, being eight days after the date of this grant, so that the same could not have been made by virtue of, or under the authority of, said state, as averred in the petition.

2d. The grant expressly declares that it is made to the said John Jiams, his heirs and successors; and does not declare in any part that it was made for the benefit of his family or any portion of them; or that his having a family was one of the moving causes; but, on the contrary, it declares that the moving causes existed in himself; and this, notwithstanding he declares in his petition that he is a man of family, but does not say of whom his family consists. Under the laws in virtue of which the grant was made, it was fully competent for the authorities making it to have granted a league of land, or more, to a single man, whom they should find possessing those merits which they should consider as entitling him to that peculiar favor.

3d. There was no onerous condition in the grant which could in any wise be construed into a consideration for the donation. The law under which it was made provides that the date of

the concession constitutes an inviolable law for the right of property and legal ownership; and although the right of property, or the donation, was to be considered as renounced in case the land was not cultivated within two years from the date of the concession, still no subsequent act or omission of the grantee could alter the title, as once vested, though it might operate as an escheat or defeasance of the same. But that defeasance could only be in favor of the sovereignty from which it emanated. [*Ibid*. 591.]

4th. The concession having been made to John Jiams only, and not to himself and his wife, it would be a violation of the expressed declaration of the concession to give a part to his wife, as much as it would to give a part to any other member of his family; and even admitting, for the argument, that the quantity of land granted was extended on account of the donee having a family, the character of the title is not thereby changed. The settlements made by the Spanish government in Louisiana were still more explicit in respect to the increased quantity of land granted in case of the donee being a married man, requiring him to furnish evidence of his marriage; and in case of his having children or slaves, the quantity was still further increased. Notwithstanding these provisions, the title to the property has been uniformly adjudged to the donee and his heirs, and to no other person. [*Ibid*. 232; L. R. 4 N. S. 212; 3 Cond. 273; L. & F. Frique *vs*. Hopkins *et al.;* Nov. Rec. Lib. 10, Tit. 4, l. 1; Novis. Rec. L. 5, Tit. 9, l. 2.] Hence it is concluded that the land sued for by the appellee was the separate property of John Jiams, the donee.

II. The proceedings of the probate court, which the appellee sets up as the title of his grantors, were null and void, because,

1st. The act of congress provides that the probate court shall hold its session on the last Monday of every month in the year, except in certain cases, in which exception this is not apparently included. The record of the court is dated 29th and 30th of May, 1837; as there is no provision for holding the court on Tuesday, or any two successive days, it is evident that, on one of those days, the court was unlawfully holden; and by refer-

ence to the calendar of that year, it will be seen that the court held its session on Tuesday, which was illegal. [Laws of Texas, vol. 1, p. 153.]

2d. The proceedings of the court in partition were not in accordance with the existing laws. [Ords. and Dec. 136.] The practice of the courts was prescribed by the laws of the state of Louisiana. The partition was made by commissioners appointed by the court, only one of whom verifies the return; the order of citation is not shown to have been complied with; the business of the succession is continued to the following term, and, without any order setting aside the continuance, the order for a decree of partition is made subsequently, and at the same term; the partition is made of part of the estate, setting aside the portion of only one of the claimants to the inheritance; there is no appraisement of the property; no reference to a notary; no homologation; and, in truth, not one act of the court, in its entire proceedings, seems to have been made with any reference to the existing laws. The introduction of a subsequent record of an attempt on the part of the grantors in 1844, years after the act was done, to alter the decree, can only confirm an opinion of the disposition of the parties which was very evident in 1837, and which a judicial tribunal should notice with marked censure. [L. Code Prac. 1839, 154, § 14, art. 924; id. 171, arts. 1020, 1021, 1024, 1027; Civil Code, art. 1130.]

III. The act of congress of 20th December, 1836, and the subsequent act of the same congress of 5th of February, 1840, shut out all evidence of title in the appellee, as derived from his deed and from the decree of the probate court, as available evidence to sustain his title, because the same was not recorded in the county in which the land lies. The provisions of both these acts evidently required such record; and the language of the 8th section of the statute of 1840, using the word "*hereafter*," as referring to the latter clause of the sentence, providing for the recording, and not to the former part in relation to the time of making the decree or order. [Laws of Texas, vol. 1; 155, 156, secs. 37, 38, 39, 40; id. vol. 4, 155, sec. 8.]

IV. There is no evidence, direct or presumptive, to establish the marriage of John Jiams and Tabitha Harris.

1st. The evidence that the parties lived in concubinage in the state of Ohio, during the lifetime of the lawful wife, Mary Haslett, and within the knowledge of the parties, is fully proven; as also that they fled from thence to avoid a prosecution for their criminal intercourse. [2 Starkie, 705, note; 2 Dow. 482, *ante*, Smith *vs.* Smith.]

2d. It is also fully proven that Mary Haslett was still living to about the year 1819, and, no divorce of the parties or death of the wife being shown, no other marriage could have been valid.

3d. Presumptive evidence of the death of the wife is not shown or intimated.

4th. The civil and ecclesiastical laws defining matrimony, and the manner it shall be celebrated, also prescribing the penalties of clandestine marriages, and the laws and decrees of Texas, are in no part shown to have been complied with. [Sala, vol. 2, 257, tit. 6, § 29; Part. 3, tit. 14, l. 14; 1 White's Rec. 300; Ords. and Dec. 138; 1 Laws of Texas, 233.]

The appellant establishes his title to the land in question:

I. By the several conveyances of the heirs at law of the estate of the intestate, being his legitimate children, John and Ruth Jiams. [1 White's Recop. 106, 115, 117.]

1st. These were the only lawful heirs of the estate, according to the laws in force at the time of the decease of John Jiams. [Part. 6, tit. 13, l. 3; N. Rec. lib. 10, T. 20, l. 3.]

2d. Such estate of inheritance passed direct to the heirs.

3d. The dominion of such estate passed direct to them on the death of the ancestor. [Feb. Mex. tit. 2, ch. 10, vol. 2, §§ 50, 103; N. Rec. L. 10, T. 4, l. 7; 1 White's R. 47, 607.]

II. The deeds of conveyance to the appellant were duly authenticated and recorded.

III. Prescription.

The appellant claims to have been in possession by his grantors, from 1827 to 1840; and under his own title in part, and by authority and in behalf of his grantors for the remain-

der, from 1st May, 1840, to 13th March, 1846, being the time this suit was instituted. [P. 3, l. 18, T. 29; N. R. l. 5, T. 8, L. 6, 11; 1 White R. 96; Sala, L. 11, Tit. 11; 1 White R. 92, 93 and 347, §§ 18, 21; Nov. Rec. lib. 10, T. 4, l. 7; 1 White's N. R. 4; Laws of Texas, vol. 1, 155, 156, §§ 35, 37, 39, 40; id. vol. 2, 84.]

ALLEN & HALE for appellee.

The only question, it appears to us, in this case, is simply *in whom is* the title to this land? There would seem to be little difficulty here. The nature of the system of colonization under which this tract was granted, the principles of the law then prevailing, and the decisions of this court, are all conclusive.

The grants of land made under the laws of Coahuila and Texas, to colonists, were essentially the results of a *contract,* the consideration of which was, on the part of the state, the settlement of the country; on the part of the settlers, the land itself. The grant was, in fact, a purchase; and often dearly bought by the toil, the danger, the loss of property and life to which it exposed the pioneer. As the result of a contract, then, as a purchase, it is to be considered, and should receive all the incidents and all the restrictions of these.

It is one of the necessary consequences of this view, that the amount and extent of the grant should depend upon the magnitude of the service done to the state. As the empresario himself was to be rewarded in proportion to the number of families which he introduced, it would be but proper that the settlers should receive a recompense varying with the size of their families. It might be impossible or impracticable to graduate this with sufficient nicety in all cases; but it was evidently fit that those already married, who would most likely still further increase the population of the country, should receive a larger grant than a single man. And such was in fact the law, under the subsequent system of the state; while it appears by the imperial colonization law in 1829 that the admission of single men was not even contemplated. [Emp.

Decree, 1823; 1 White N. R. 592, commencement; Col. Law 25, § 15; White N. R. pp. 588, 390.]

If, then, the grant was not made to a head of a family because he was a man, but because he was *married* or *had children*, it would necessarily follow that his wife and his children were in part, at least, the means of obtaining the land. It was earned by them — bought by their toil and suffering, as well as by his; and intended as much as a recompense for their presence and their labor in the promised land, and a support in their after years, as it was for his. The state which they have benefited, the people whom they have assisted, will not certainly be disposed to wrest from them the hard earnings of their lives, to confer them upon strangers — aliens to the enterprising and heroic spirit of the men who settled this country, as well as to the state itself.

There are two suppositions possible. Either Mary Jiams was living all the time that her husband, John, was in Texas, or she was not.

First. Suppose she was living.

The question, then, is this: Was Tabitha entitled to receive the same proportion of the land granted to John Jiams as Mary would have been had *she* been in her place? or, in other words, did the law in force at the date of the grant, and applicable to it, deprive Tabitha of the right of claiming half the acquisitions made during her connection with John Jiams?

We do not purpose to consider here whether a wife would be entitled to half the grant made to her husband; but simply whether, *if that were so*, the fact that a former wife was living in Ohio, or elsewhere in the United States, would affect the right of a second wife in Texas.

We take it to be indisputable, that, in a suit where the fact of marriage comes collaterally in question, it is not necessary to produce direct proof; but that general reputation, and living together as man and wife, will afford sufficient presumption to establish the fact. It must then be supposed that John Jiams and Tabitha, coming here together, living for five years together, represented in the census of Austin's colony as man and wife,

and having had three children as such, were in fact married. Whether the marriage was made null by the former contract with a woman still alive, is the point here.

The Catholic religion, regarding marriage as a sacrament, does not give its sanction to those contracted against its rites and according to Protestant forms. A country essentially Catholic, requiring an adherence to that faith from every permanent resident, imposing it as a condition on every colonist, could not be thought to look with more favor on a union consummated in a foreign and Protestant country, between a faithful son of the church and a heretic — between a citizen and an alien — than the rest of the Catholic world. Its policy and its faith alike forbade it to recognize as valid a contract so repugnant to both. The marriage of John Jiams with Mary Haslett received all its validity from the laws of Ohio, and would only preserve it in those countries which recognized those laws. And as this recognition is only the favor of international comity, it would not be granted in cases where it was repugnant to the laws or the policy of another state, or injuriously affected its citizens. We may safely say, that had this question arisen in the courts of Mexico at the time of the residence of John Jiams here, those courts would not have pronounced a Catholic marriage, celebrated between two citizens, invalid, in consequence of a former union with a Protestant woman, separated from her husband, and an alien to the state. [Sala, L. 1, T. 4, § 17; Partid. 4, T. 2, l. 15; Walter, Man. de Derecho Ecl., §§ 300 318, 313; Febrero Mexicano, L. 1, Tit. 2, ch. 10, § 33, in medio.]

But suppose the marriage of Tabitha was void — suppose she was the mere concubine of John Jiams, does that make him the less a head of a family? or lessen the value of her services? or affect her rights? Looking at the grant as the result of a contract, in performing which this woman did a part, can we say that she who made up the family for whose emigration and settlement the grant was made — who gave three children to Texas — shall be compelled to abandon what she has earned to one who, with much greater reason, might be stigmatized as

a "strange woman?" The object of the grant, natural justice, and the law of Spain, are equally against this conclusion.

In the first place, if Tabitha supposed that she was legally married, and that Mary Jiams was dead (and there is nothing against this supposition), she would receive one-half.of the acquisitions during the time of her connection. [Febrero Mexicano, p. 226; L. 1, T. 2, ch. 10, § 21.]

And if the separation of John Jiams from Mary was by mutual consent, she (Mary) would lose her right to participate. [Id. § 43 et ult.] And so, too, if Mary had herself renounced the participation; and surely nothing can be a greater proof of that than her absence from Texas and her husband. [Sala, L. 1, T. 4, § 20; Nov. Rec. L. 10, T. 4, l. 9.] And so, too, if she were a Jewess, Moor, or of any heretical sect. [Febrero Mexicano, Loc. Cit. § 33, in medio, and authorities cited.]

Upon the supposition, then, that Mary Jiams was alive in 1824 when the grant was made, and afterwards, it still appears that Tabitha was entitled to the same proportion of land as if Mary had not been living.

But what is there to lead us to suppose that Mary Jiams was living in 1824? The statement of facts does not show it; for she appears, by that, to have disappeared some time in 1818. Nothing more is known or said of her. It is true that, in ordinary cases, the presumption of life is favored, but not in such a case as this. The presumption of the legality of the connection between John Jiams and Tabitha—the presumption that the latter were innocent of the criminality of an adulterous union, is, at the least, as strong as the general and uncertain presumption that Mary Jiams was living. The law requires strong proof to establish illegitimacy and bigamy; and the precise question here is, whether such proof as this record presents would warrant a verdict against John Jiams in a criminal prosecution? Is it not, in fact, the duty of a court, if there are two suppositions equally possible, by one of which a crime is imputed and the loss of property effected, and by the other the innocence of the parties is vindicated and their property secured to them, to adopt the latter? Will not every court and

every jury say that it is more probable that Mary Jiams was dead in 1824, five or six years after her disappearance, than that John and Tabitha should have been received in Austin's colony and lived together there, as man and wife? [See R. vs. Twyning, 2 Barn. & A. 386; 3 Starkie on Ev. Title Polygamy; 1 Greenleaf Ev. § 35.] In this case, it was held that where a woman, twelve months after her husband was last heard of, married again and had children, that it was a legal presumption that her former husband was dead. [5 Partidas, 3 Tit. 14, 1. 12; Sala, L. 3, Tit. 6, § 27; Walter, Manuel de Der. Ecl. § 317.] If, then, any court would suppose that Mary Jiams was dead in 1824, is it not equally clear that Tabitha was the legal wife of John Jiams? She makes a part of "the family" of which he is the head. She is described in the census as "su muger"—"his wife;" and she lives with him for five years or so, bearing him children.

Acts of this character, and such general reputation, are sufficient in a case of this kind to establish marriage. [3 Starkie Ev. Tit. Marriage, 705; 1 Greenl. Ev.; 1 Starkie Ev. 29.]

Let us suppose, then, that Tabitha was the lawful wife of John Jiams at the time of the grant. It will be seen by reference to the former brief filed in these cases, that she would be entitled to one-half of the acquests and gains during the marriage. There is no doubt of the law as to property generally; and it is only contended by the defendant below that this was a case of a special donation, made to John Jiams personally, and therefore incommunicable.

But we trust it sufficiently appears by what we have before said, that this grant was not a mere donation, but a recompense for services done by Tabitha as well as by her husband; and, if so, it is well settled that it should enter into the community — no matter to whom the grant *purported* to be made. [Febrero Mexicano, L. 1, Tit. 2, Ch. 10; De los bienes gananciales, §§ 1, 4, 14, 15; Sala, L. 1, Tit. 4, § 22.]

It appears, then, that Tabitha Jiams was clearly entitled to a moiety of the land, as the half of the bienes gananciales acquired during marriage.

But if this were not her clear right, independent of a judicial decision, the decree of the probate court of Harris county would, of itself, be conclusive evidence of her title, not to be *collaterally* attacked in this suit.

That decree assigns to her the southwest half of the league; and that portion passes to the plaintiff below by her deed. What more is requisite ?

The possession of the defendant below cannot assist him; for it does not appear by the statement of facts that he has ever had possession since the time when his tenant was forcibly ejected by the plaintiff in 1840.

The fact that the conveyance from Tabitha Jiams to Gen. Houston was recorded in Harris county some ten days after the creation of the county of Liberty, in which the land lies, has nothing to do with the matter. It would only affect the case if the defendant was claiming under a junior deed from our grantor, without notice, and cannot strengthen his title derived from any other source. And if it could, it sufficiently appears by the *correspondence* between the defendant and the plaintiff, that the former was aware of the opposing title, and that he intended to contest its validity on other grounds than want of notice.

We feel confident, therefore, that the nature and strength of our title, and all the considerations of public policy and national good faith, will lead the court to a decision in favor of the title of the plaintiff below, in the first of these cases, and in confirmation of the judgment already pronounced.

We have now only to consider the second of the cases named in this brief.

It will not be contested, that, if Tabitha Jiams was entitled to one moiety of the league, the other belonged to the children of John Jiams. To which of those children? is exactly the question here.

Ruth Jiams and John Jiams, Jr., were the children by the first marriage; and if that union would have been considered void in the courts of Mexico, so far as it conferred rights to land in Mexico at the time of the death of John Jiams, they

could not inherit while legitimate children were living. We refer, then, to what has been already said as to the validity of a Protestant marriage, and to the numerous authorities cited.

But if the first marriage *was* valid, what are the claims of Ruth Jiams? She was an alien; never came to Texas, but remained in Ohio. This court has already decided, in the case of Holliman's Heirs *vs.* Peebles, that she could not take by descent; and in the division of the estate, therefore, she is to be left out of the question, if indeed she is not concluded by the decree of the probate court.

John Jiams, Jr., however, if the marriage of his mother was valid to invest him with any right in a Catholic country, would come in with the other children, and he has conveyed his interest to the defendant below. That defendant, therefore, becomes in his place a tenant in common with the other children, of the northeast half; but his claim does not exclude the title of John D. Jiams, George W. Jiams, and Sarah Ann Jiams, now Mrs. Fosgate. As the children of John Jiams, born in Texas, always residing here with their father and mother, they are in every way entitled to inherit equally with their half brother.

It may be objected, however, that as there does not appear to have been a second partition of the northwest half between them and John Jiams, Jr., they have no right to an action of ejectment as against a fellow-tenant in common. But this objection cannot be sustained, for two reasons:

First. It ought to have been raised, if at all, by a plea in abatement.

Second. It is unfounded and inapplicable, because a tenant in common can maintain an ejectment against a fellow where there has been an actual ouster. [Tillinghast, Adams on Ejectment, pp. 54, 55, 56, notes; p. 91 and note; Shephard *vs.* Ryers, 15 Johns. R. 501.]

And it is evident that here there has been an actual ouster; for it appears that John Jiams, Jr., who was upon the northwest half of the league in April, 1840, and in possession thereof, forbid Jones, the agent of Gen. Houston, who came there by the approbation of the other children of John Jiams, from

landing; and, by his deed to the defendant below and all his acts, claimed, as the defendant also does, the exclusive right and possession. This amounts to an actual ouster. [Cummings *vs.* Wyman, 10 Mass. 461; Higbee *vs.* Rice, 5 Mass. 352.]

The plaintiffs, indeed, simply claim their legal right — that of possessing and enjoying, in common with Yates, the common estate; and this court will not deny to them a right created by the very nature of their title, and necessary to its preservation, against the tortious acts of their fellow tenant.

J. W. HENDERSON, same side; no brief furnished reporters.

Mr. Chief Justice HEMPHILL delivered the opinion of the court.

The principal questions on this appeal are:

1st. Is the judgment of the probate court of Harrisburg county, awarding to Tabitha Harris, wife of David Harris, the land in controversy, conclusive in favor of her right to the same, and not subject to question or impeachment in a collateral action?

2d. Was the said Tabitha Harris, during the lifetime of John Jiams, deceased, and at the time of the grant of the land from the government of Mexico, to be regarded as his lawful wife, and entitled to the rights arising from the matrimonial relation?

3d. Is the league of land, of which one-half was decreed to the said Tabitha by the probate court, community property, and, as such, divisible between the survivor and the heirs of the deceased partner of the marriage?

There are other questions of minor importance, relative to evidence and prescription, which will be noticed before the conclusion of the opinion.

The first ground relative to the conclusive effect of the judgment of a probate court is one which will not, on the present occasion, be discussed to any extent, as the question is pending in other causes, and has not received the thorough investigation from counsel, or consideration by the court, due to the importance of the principles involved, or the immense amount of property to be affected by any general rules established in the decision.

In this case it is clear that the court had jurisdiction of the subject matter and of the parties, and there are certainly no obvious grounds why, in relation to this decree, there should be an exception to the general rule that judgments, rendered in the exercise of a competent authority, are reversible only in an appellate court, and cannot, collaterally, be treated as a nullity. It is believed that the judgment cannot, in this suit, be disregarded on any of the grounds urged against its validity by the defendant; but the question would have been left open in this case had we not been satisfied that Mrs. Harris, independent of the judgment, is legally entitled to one-half of the league of land granted by the Mexican government to the deceased husband. [See 2 Howard's U. S. Rep. p. 309; 10 Peters' R. 473; 2 Peters, 165; 3 Peters, 204, 205; 1 Peters, 340; 6 Peters, 729, 730; Duchess of Kingston's Case (Smith's Leading Cases), p. 424.]

The second question for examination is, whether Mrs. Tabitha Harris was, in legal contemplation, the wife of John Jiams at the time of the grant of the land from the government of Mexico.

It appears from the statement of facts and the depositions, that John Jiams, senior, was lawfully married in the state of Ohio, in the year 1809, to one Mary Haslett, and that they lived together as man and wife until 1818; that by his direction she then left his house and went to reside with his mother, and never afterwards returned to him; that after her departure from him he went down the Ohio river, and was gone some months, and afterwards returned to Jefferson county, Ohio; that shortly before his return the said Mary, his wife, went down the Ohio river, and it does not appear that they ever again met; that shortly after the return of the deceased he again departed down the Ohio river, and never afterwards returned to his former residence in Jefferson county; and that some months after his last departure the said Tabitha Harris, known then as Tabitha Kincaid, with two children of the said John Jiams, senior, and his wife, Mary, viz.: Richard Jiams and John Jiams, Jr., were conveyed to the said John Jiams, senior, below Cincinnati, on the Ohio

river, and that he, together with the said Tabitha and the two children, removed to Bayou Sara, in Louisiana, where they lived until 1822, when they removed to Austin's colony in Texas, the said Richard having in the meantime departed this life; that the said John Jiams, senior, the said Tabitha and the said John Jiams, Jr., lived together on the league of land, the half of which is now in controversy, from the year 1822 until the death of said John Jiams, senior, in 1827; that the three children of the deceased and the said Tabitha, mentioned in the petition, were born after their arrival in Texas; that the family were duly received as colonists, which, at the time of the grant, consisted of the deceased, as the head, the said Tabitha, John Jiams, Jr., and such of the children of the deceased and the said Tabitha as were then born. An extract from the statistical census of Austin's colony, compiled in March, 1826, by the empresario, in accordance with official orders, was offered in evidence, in which the said Tabitha ranked as the wife of the said John Jiams, deceased, and they were classed among the married men and women of the colony.

It appears from the depositions that the said Tabitha lived with her father about four miles from the residence of the said John Jiams, in the state of Ohio; that she was acquainted with him, but the witness did not know that she was acquainted with his wife; that the said Tabitha lived a short time in Jiams' house before his removal, and that he acknowledged as the cause of his removal his apprehensions of penal consequence from his living with the said Tabitha, and also concerning his wife, Mary. But there is no evidence that the said Tabitha knew that this was the cause, or that she had any such apprehensions.

It further appeared from the deposition of witnesses, relatives of the said John Jiams, deceased, living near his former residence in Ohio, and with whom one of his children remained, that Mary Haslett, his former wife, had not been heard of from the year 1818 until the taking of the depositions in 1847, nor is there any evidence of her existence subsequent to the former year.

From this evidence, it appears that at the time of the

family's emigration to this country, all knowledge of the existence of the former wife had, for four years, been lost. That from the time of their ingress into Texas until the death of the deceased, the said Tabitha and the deceased cohabited as man and wife, to whom children were born, and were reputed to be married, as must be presumed in favor of innocence where there is no evidence to the contrary, and as is show~. from the empresario's official report, in which they are ranked as man and wife, and as a portion of the married persons of the colony.

There was not, in law, any legal impediment to the marriage union between the deceased and the said Tabitha at the time of their emigration to the colony, or, at least, at the date of the grant from the government of Mexico.   Four years had elapsed after the disappearance of the former wife before the appearance of the deceased and the said Tabitha, as husband and wife, in this country, and six years before her right, by virtue of the marriage, to the land in dispute, began to accrue. The rational presumption, after this lapse of time, is, that the former wife was dead; her sister-in-law, being in charge of her only daughter, having not heard of her since the year 1818.

The ordinary presumption in favor of the continuance of human life should not, under the facts of the case, outweigh the presumption in favor of the innocence of their cohabitation, and that there was no legal impediment to their contracting the matrimonial relation.

Where a woman was married within twelve months after her husband left the country, the presumption that she was innocent of the bigamy was held to preponderate over the usual presumption in favor of the continuance of human life.   [2 B. & Ald. 386; Shelford, 226.] . This author states that there is no strict presumption of law on questions of fact as to the continuance of human life, without reference to accompanying circumstances, as the age or health of the party, etc.   If the first consort be shown to have been alive within a short time of the second marriage, the law in favor of innocence cannot presume that the party was not alive at the actual time of the sec-

ond marriage; and as an instance where the presumption of innocence cannot arise, he refers to a case where the first wife had been heard of twenty-six days before the date of the second marriage. [Shelford, p. 226, and cases cited.] This does not militate against the inference of innocence in the case under review, as four years had elapsed after all trace of the former wife had been obliterated, before the parties are presented within the limits of this country as man and wife; and this is the earliest period, or rather two years later, at which there is any necessity for inquiry into the character of cohabitation between the parties, as the rights of the plaintiff and defendant depend on the fact of the existence of the marriage at the date of the grant.

There is no evidence as to the character of their intercourse in Louisiana, but on their emigration to Texas it assumes all the distinctive marks of the matrimonial relation, and the only argument which can be urged against the actual subsistence of the marriage relation, from and after that period, and the innocence of the cohabitation, must be founded on the supposition, that, as the intercourse was illicit at its commencement, it must have always so continued.

But admitting that their original intercourse was illicit with the knowledge of both parties, it would be urging the presumption to an unreasonable extent, to suppose that the unlawful character of the connection was unsusceptible of change, and that, when all legal disabilities had ceased to operate, they would voluntarily decline all the honors, advantages and rights of the matrimony, and prefer an association disgraceful to both parties, but peculiarly degrading to the female, and which inflicted upon their innocent offspring the stigma and penalties of illegitimacy.

Let it be admitted that this woman had, knowingly, wandered from the paths of virtue, and that in the weakness of human frailty she had originally yielded to the arts and seductions of the deceased, yet the conclusion does not necessarily follow that the latter would be unwilling to repair, as far as possible, the wrongs he had inflicted, or that the former would, of choice,

continue in a position so humiliating, and which, if the defense to this action can be maintained, would not be superior to that of a slave ministering to the wants of a master and nurturing his son, and liable to be driven from her home without compensation for all her toils and privations encountered in the support of the family in the midst of the wilderness. The judgment which would presume that erring humanity would not repent and reform is too harsh to have place in any beneficent system of law, and we cannot yield our assent to any such doctrine. When these parties emigrated, it was well understood in the colony that a married woman was entitled to one-half of all the property acquired by onerous title, during the existence of the marriage, and it is but a reasonable presumption that, even on this ground, the parties would assume the position in which this right could be secured. Had they not been generally regarded, during the whole period of their residence in Texas, up to the death of the deceased, as man and wife, the fact could, doubtless, have been established with abundant facility. It was proven that they were not so regarded in Ohio four years anterior to their removal to Texas, and the character of their association in this country could have been, certainly, still more easily shown by proof.

All the circumstances lead to the conclusion of the innocence of the cohabitation of the parties in this country. The families on their arrival in the colony were required to accredit their good character and habits, and we must presume that this was done, and that the deceased and the woman, with whom he lived in continued intercourse, were duly certified to be man and wife; and that this was the case is manifest from the official census, in which they are classed as man and wife and a portion of the married inhabitants of the colony.

From the facts presented, we are of the opinion that the parties were regarded as man and wife during their residence in Texas; that no legal impediment, in point of fact, existed to their marriage for nearly four years antecedent to their immigration, and that the evidence is sufficient to establish, for all the purposes of this suit, the subsistence of the marriage, and, consequently, Mrs. Harris is entitled to all the rights of the

lawful surviving wife of the deceased. [Shelford, p. 99; 2 Starkie, p. 510.]

The next question is, whether the league of land granted under the colonization law of 1823 is to be regarded as community property, and, as such, subject to division between the surviving, and the heirs of the deceased, partner of the marriage?

This point involves important principles and a large mass of the most valuable lands of the country; and it is to be regretted that, under the circumstances, we cannot give the subject that thorough examination it eminently deserves.

There is, in one respect, a distinction between the character of the grants under the colonization law of the empire and those under the subsequent laws of the state. In the former, there does not appear to have been any price in money fixed, to be paid for the land itself as the consideration, or one of the considerations, for the grant; and it has been contended that the grants under the former were pure donations, and, consequently, the separate property of the head of the family to whom the donation was made.

In opposition to this view, it has been urged that the land was acquired by onerous and not lucrative title, and this, principally, on the following grounds, viz.:

1st. That the commissioner's fees, office fees, stamp paper, surveying fees, etc., amounting to a considerable sum, were required by law to be paid before the colonist could be put into possession of the land.

2d. An onerous condition, of cultivating the land within two years, was attached to the grant, and it should, therefore, be deemed a recompense for services rendered by the matrimonial community, and as their reward for settling up the wild and uncultivated wastes of a new country.

Let us inquire, as preliminary to an examination of these positions, of what the community property is composed. In the "El Diccionario de Legislacion" it is defined to be such as the husband and wife, or either of them, during the matrimony, shall acquire by purchase or by their labor and industry; also, the profits of the separate property which each

brings into the marriage, and also the profits of that which each shall acquire, by any lucrative title, during the continuance of the conjugal partnership [p. 272]. This definition is founded upon the laws in Tit. 4, lib. X, Novissima Recopilacion. Where property is acquired in the name of both partners it becomes common, whether the accession be by gift or purchase; but when received in the name of one, whether it should be classed with the separate or the community property will depend upon the character of the title. If this be onerous, the property is ranked with the gains of the community; if lucrative, it belongs to the separate property of the partner who is the beneficiary of the gift.

An onerous title is defined to be that by which we acquire any thing, paying its value in money, or in any other thing, or in services, or by means of certain charges and conditions to which we are subjected. [Diccionario, p. 672.]

It will be perceived that, although there is no price fixed by the law for the land itself, yet there is no provision that the land shall be given and the titles extended gratuitously, as was authorized in grants of a particular character under the decree of the Spanish cortes of the 4th January, 1813.

There being no requisition that the grant should be wholly gratuitous, the payments on land titles were left to the regulation of the proper authorities, and their amount was fixed at one hundred and sixty-five dollars [see Austin's Pamphlet, p. 20, in note], which was to be discharged before the execution of the title. The grant itself contains a recital that the title will issue on payment of the fees designated in the fee bill, promulgated by the political chief of Texas on the 20th May, 1824.

It would seem that where the government requires, by public order, a sum of money so considerable in amount to be paid before the issue of the title, and as an indispensable condition to its delivery, that the grant could not be justly regarded as a pure donation. Nor can it be regarded as bought with the separate funds of the husband. There is no provision of law which requires or authorizes the separate property of the head of the family to be expended for this purpose; and, where there is no

showing to the contrary, the presumption always is that the advances proceed from the funds of the community, and purchases are made for its benefit and augmentation.

The fact that the grant was made to the head of the family is an immaterial circumstance, provided it was founded on considerations which impress upon it the character of a purchase, or of property acquired by onerous title.

The headright grants under the state colonization laws, in which some consideration was paid for the land itself, were made to the heads of families. And if, by law, lands were expressly directed to be sold to families, to a greater or less amount, according to the merits and circumstances of the applicants, and the grants were made in the name of the heads of the families, it could not be contended that such lands were the separate property of the husband. Is there any substantial difference between such sales and this grant, where the title was, by public authority, directed not to issue until after the fees were paid? But, on the second ground, we are of opinion that the grant was in consideration of services to be rendered, and should, therefore, be regarded as a portion of the ganancial property of the marriage. The object of the government in the law of colonization was to settle the vast wilderness of a remote frontier with a reputable, hardy and industrious population. "Agriculture, industry and the arts" were to be promoted, and, to accomplish this, grants of a large amount of land were offered to emigrant families, but not gratuitously; not simply on the ground that they would introduce themselves into the country; but that they should cultivate the lands, and that within two years from the date of the concession. The inquiry then arises, by whom is this to be accomplished?

Are we to suppose that the husband is the sole cultivator? That fields are to be opened, and lands stocked with cattle, without the assistance of his partner, and the expenditure of their joint funds? And, in fact, it seems immaterial whether the whole of the labor and money be bestowed and expended by the husband or not, provided such was the necessary condition and charge by which title could alone be originally ac-

quired or subsequently preserved. By the principles of the law then existing, the results of the labor of the partners, and of each one of them, became common property. It is of no consequence whether one contribute more than the other to the acquisition, or whether it be procured by the labor and traffic of one alone, it is common to both by virtue of the subsisting partnership, through which their acquisitions are reciprocally communicated. [Diccionario, p. 73.]

The position is fallacious which assumes that the land is already granted, and that the labors of the wife are repaid by her community interest in the value of the improvements made, or cattle pastured on the land.

If the land can be retained only by services to be rendered or labors performed by both of the partners or by one, and the profits by law accrue to both, it would be inequitable that the labors of the one should be rewarded by the land and half of the improvements, and that of the other by only half of the latter. To this she would be entitled on property brought by the husband into the marriage as his separate estate, and of which the title was fully vested in him, and to procure or preserve which no expenditure of labor or money is necessary; but where these expenditures and services can alone procure and secure the title, she should certainly be entitled to an equal share of the reward bestowed. These grants were, in fact, dearly purchased by the unparalleled toils and sufferings of both the partners; and the fruits of their labors, under a system of laws where the community interests are protected with such jealous vigilance, should be equally distributed.

It cannot be said that if the land be not appropriated exclusively to the husband, each member of the family is as much entitled to a distributive share as the wife, inasmuch as the services of the whole are rendered to secure the title. This is answered by the consideration that, under the laws, the services of the family are always to be rendered for the benefit of the community, and not for its individual members, especially those in a subordinate relation. The law was framed to secure the migration of women as well as men. Their presence was indispensable to the domestic happiness of

individuals, and to the order, welfare and continued existence and prosperity of the colony.

It cannot be supposed that a legislator, under the Spanish system, would intend that in a grant to be made to a family, consisting of a husband, wife and children, and this on onerous conditions, that the rights of the wife, as partner in the conjugal society, should be disregarded. The presumptions of law strongly favor the rights of the community, and they should have their due force where the law is not too clear to exclude their operation.

Without discussing the subject further in the present case, we state our conclusions to be that the grant cannot be regarded as a pure donation, and that the land constitutes a portion of the common property of the former conjugal partnership between Mrs. Harris and the deceased, John Jiams, senior.

The admission of the deed to the plaintiff, as evidence, should have been excepted to at the trial. The deed is not invalidated for the want of record in the proper county, but is only divested of its legal effect as against third parties who have had no actual notice of its existence. [Crosby vs. Huston, 1 vol. Texas Report.] This could not be alleged by the defendant, if even he were claiming under a junior deed from the same grantor, as the evidence proves to the contrary. The operation of the 8th section of the act concerning conveyances, [Laws of 1840, p. 155] is prospective, and does not affect the admissibility of a decree in partition, rendered before the passage of the statute.

The plea of prescription cannot avail the defendant. There was no possession by either party. This was attempted by the plaintiff, and, by mistake, some tenants of the defendant were ousted from the other half of the league, and the possession retained from 1840 to 1843, from which time there does not appear to have been a possession, actual or attempted, by either party, of the land in controversy.

It is ordered that the judgment be affirmed.