## MARY E. SCHAFFER

*vs.*

## THE ESTATE OF MARGERY J. RICHARDSON.

*Marriage and legitimacy : burden of proof.*

When a marriage has been consummated in accordance with the forms of law, it is presumed that there were no legal impediments to such marriage; and the fact, if shown, that either or both of the parties have been previously married, and that the other party to such previous marriage was still living at the time of the second marriage, the presumption is that the former marriage had been legally dissolved; and the burden of proving that the former marriage had not been dissolved rests upon the party seeking to impeach the second marriage.        pp. 93-94

*Decided January 14th, 1915.*

Appeal from the Orphans' Court of Baltimore City.

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Alfred J. O'Ferrall* and *James M. Muller,* for the appellant.

*Charles G. Baldwin* and *G. Ridgley Sappington,* for the appellee.

BURKE, J., delivered the opinion of the Court.

Letters of administration were granted by the Orphans' Court of Baltimore City to Thomas C. McGuire on the estate of Margery J. Richardson who died intestate on April 13, 1913. He reduced the assets of the estate to cash, and upon his petition the Court fixed November 27, 1913, as the day for the meeting of distributees with a view of making distribution of the residue of the estate in the hands of the administrator to, those entitled to receive the same.

A contest arose over one-quarter of the estate. Upon the evidence embraced in the record, and after full hearing, the Court ordered that the one-quarter of the estate in controversy be distributed among the appellant and the appellees in equal portions. From this order the appellant has prosecuted this appeal.

The only next of kin of Margery J. Richardson were the children and descendants of two brothers and two sisters who predeceased her. One of her brothers was James Washington McGuire, who died in Honolulu, Hawaii, in July, 1912, and the dispute in this case concerns the one-fourth part of the estate, amounting to two thousand seven hundred and seventy-five dollars, to which he would have been entitled, if living.

In 1848 he married Mary Eliza Smith, and lived with her in Baltimore. They had one child, Mary E. Schaffer, the appellant on this record. The record tells us very little about him or his wife during his residence in Baltimore. He was a ship carpenter, and was accustomed to be absent from his home for long periods of time. He left Baltimore in 1849

and went to California, and never returned, except on one occasion, when he looked for his wife and child, but failed to find them. His wife went to Virginia to live prior to the Civil War, and in 1866 procured a divorce from him in that State on the ground of abandonment. She has not been seen or heard from for many years, and is presumed to be dead. The daughter saw her father last about the year 1854 when she was five years old. When seven years old she was taken to the home of Mrs. Richardson, her aunt, with whom she lived for about eight years. During which time her father sent fifty dollars every six months for her support. Very little is known of the father after he left Baltimore until the year 1855, at which time he was residing in Honolulu.

On the 14th of September, 1855, he was baptized and married in Honolulu, Hawaii, by the Reverend Father Herman, a priest of the Roman Catholic Church, to Maria Vanbergin, and lived with her in Honolulu as man and wife until his death in 1912. That this marriage was celebrated according to the rites and ceremonies of the Roman Catholic Church is clearly established by the evidence. We quote from the depositions of Mrs. Maria McGuire, Frank Andrade and Charles B. Wilson:

Mrs. McGuire:—"I was married to James Washington McGuire September 14, 1855, by and in the presence of the Reverend Father Herman in Honolulu, Territory of Hawaii. My father being also present, and he is now dead."

Frank Andrade:—"While I did not see them actually married, from my early boyhood about 1855, these two people, Mr. and Mrs. McGuire, were always known as a married couple, associating with some of the best families in Honolulu, passing each other off to their friends and associates as husband and wife, and at the same time rearing and educating a large family of children."

Charles B. Wilson:—"I did not see the marriage cere-
mony performed, but I do know that Mr. and Mrs.
McGuire were living together as married people gen-
erally do.  When I met them in 1867 they had some
children, and later on had other children, and I do
know that it was generally known and understood
that Mr. and Mrs. McGuire were married people, and
in all the years that I have known them this fact has
never been questioned."

The nine appellees on this record, whose ages range from
58 to 30 years—three of whom reside in California—are
children by this marriage.

They claim to be legitimate children of James Washing-
ton McGuire, and as such entitled to share in the distribu-
tion of the portion of Mrs. Richardson's estate, which he, if
living, would have taken.  Mary E. Schaffer, the appellant,
and the only issue of the first marriage, claims to be the only
legitimate child of James Washington McGuire, and that
she is entitled to have the whole share paid over to her.

The question arising from these conflcting contentions is
the validity of the second marriage which occurred on Sep-
tember 14, 1855.

Omitting the consideration of the evidence offered to sup-
port the claim set up by the appellees that James Washing-
ton McGuire secured a divorce from his wife in San Fran-
cisco prior to the second marriage, and considering the case
upon the facts stated, the question is:  Are they sufficient
in law to show the validity of the second marriage?  This
precise question has not been decided by this Court, and it
cannot be denied that there is some conflict upon it in the
decided cases.

It would be an interminable, as well as a hopeless task, to
discuss all the cases upon the subject, or to attempt to recon-
cile or distinguish them.  But there is sound reason and
abundant authority for holding that, under the circum-
stances stated, the contention of the appellant ought not to be

sustained. Of course, if the first marriage was subsisting at the time James W. McGuire contracted the second, there can be no question that the last marriage was void; but there appears to be no imperative rule of law which requires us to hold, under the facts disclosed by this record, that the prior marriage was subsisting.

When it is shown that there has been a formal ceremony of marriage, such as that proved with respect to the marriage of September 14, 1855, the law presumes the competency of the parties to enter into the marriage contract, and when it is shown that the marriage was solemnized by a person acting as minister and followed by cohabitation it will be presumed that the person assuming to officiate at the ceremony was authorized to perform it, that a license was properly issued, and that in the absence of additional or countervailing proof it will be presumed that all the proceedings were regular and valid. 19 *Am. & Eng. Ency. of Law,* 1203-4, and cases cited in the notes.

There appears to be a general concurrence of authority in favor of the proposition that when a marriage has been solemnized according to the forms of law every presumption will be indulged in favor of its validity, or, as stated in *Bowman* v. *Little,* 101 Md. 273, that "the law presumes morality, and not immorality, marriage and not concubinage, legitimacy and not bastardy."

The tendency of the courts is to hold the second marriage valid especially if there is issue which may be bastardized by a contrary holding, and if the marriage has not been questioned for many years its validity will not be overcome by the mere proof of a prior marriage. In such case the presumption in favor of innocence, morality and legitimacy will prevail over the presumption of the continuance of the former marriage, and it will be presumed that the first marriage was not binding at the time of the second.

This doctrine is well supported by adjudged cases in many States. *Pittinger* v. *Pittinger,* 28 Col. 308; *Hallums* v.

*Hallums,* 74 S. C. 407; *Hunter* v. *Hunter,* 111 Cal. 261;
*Potter* v. *Clapp,* 203 Ill. 592; *Wenning* v. *Teeple,* 144 Ind.
189; *Scott* v. *Scott* (Ky.), 77 S. W. 1122; *Maier* v. *Brock.
et al.,* 222 Mo. 74; *Hadley* v. *Rash,* 21 Mont. 170; *Wingo* v.
*Rudder,* 120 S. W. 1073; *Stevens* v. *Stevens,* 56 N. J. Eq.
488; *U. S.* v. *Green,* 98 Fed. 63.

Proof of subsequent marriage alone makes out a prima
facie case as to its validity.   To overcome this prima facie
case, proof of a former marriage is required and also evi-
dence from which it may be concluded that it has not been
dissolved by death or divorce.   *In re Colton,* 129 Ia. 42; *Pat-
terson* v. *Gaines,* 6 Howard, 550.

It is said in *Wenning* v. *Teeple, supra,* that "It is settled
law in this State that when a marriage has been consummated
in accordance with the forms of law it is presumed that no
legal impediments existed to the parties entering into such
marriage, and the fact, if shown, that either or both of the
parties have been previously married, and that such wife or
husband of the first marriage is still living, does not destroy
the prima facie legality of the last marriage.   The presump-
tion in such a case is that the former marriage has been
legally dissolved, and the burden that it has not rests upon
the party seeking to impeach the last marriage." *Boulden* v.
*McIntire,* 119 Ind. 574; *Yates* v. *Houston,* 3 Texas, 433;
*Dixon* v. *People,* 18 Mich. 84; *Harris* v. *Harris,* 8 Ill. App.
57; *Greensborough* v. *Underhill,* 12 Vt. 604; *Rex.* v. *Inhab-
itants of Twyning,* 2 Barn & Ald. 386; *Squire* v. *State,* 46
Ind. 459; *Klein* v. *Laudman,* 29 Mo. 259; 1 *Bishop, Mar-
riage and Divorce,* Sec. 457.

In an elaborate note to the case of *Pittinger* v. *Pittinger,*
to be found in 89 Am. St. Rep. 199, the author states: "If
it is shown that a party to a marriage has contracted a pre-
vious marriage and that his or her former spouse is still liv-
ing, this has been held not to destroy the *prima facie* validity
of the second marriage.   In such a case it has been presumed
that the first marriage has been dissolved by divorce, and that
the burden to show that it has not rests on the person seeking

to impeach the last marriage, notwithstanding he is thereby required to prove a negative. Here, the presumption of the continuance of the first marriage is made to yield to the presumption in favor of the validity of the second marriage and of the innocence of the parties to it." And he cites many cases to support this statement.

In *Maier* v. *Brock,* 222 Mo. 74, the precise question presented by this appeal was decided. The facts in that case were, that Joseph Maier had married the appellant, Barbara, in Germany, in 1865, and that they had lived together as man and wife until 1866, when he left her and came to the United States. Shortly after he reached this country she heard from him once, but no more until the year 1885, when he visited Germany, and she then saw him for the last time. He went to Missouri some time between the years 1872 and 1874, and took with him a second wife, who lived with him until her death. He then married Marie Balduff, with whom he lived until her death. Two daughters were born of this marriage, who were grown young ladies at the time of the trial of the case. He then married a third wife, from whom he was divorced, and on January 17th, 1902, he again married, and lived with his fourth wife until his death. Of this marriage a posthumus child was born. Maier died in 1904, seized of real estate. Barbara Maier, whom he had married in Germany, instituted suit for the assignment of dower, claiming to be the only legitimate wife of the deceased. These facts presented for decision the main legal proposition in the case, viz: That the subsequent marriages in this country raised a presumption that Maier had been divorced from his first wife prior to his subsequent marriages. In a well considered opinion in which many cases were examined, the Court sustained this proposition, and held the subsequent marriages valid. The same contention was made in that case in support of the appeal of Barbara Maier as was urged upon the Court in behalf of Mary E. Schaffer. The language of the concluding portion of the

opinion may be appropriately applied in this case: "To lend our concurrence to the contention of counsel for appellant would be equivalent to holding Maïer was a bigamist and had lived the life of a criminal for thirty years in our midst; that his wives were concubines and his children bastards. Such a thought is abhorrent to all law and repulsive to every sense of right and justice, and no Court would be justified in so holding, except where the evidence in a case should show such facts to be true beyond a reasonable doubt. Christian marriage is the very foundation upon which the family and the home are based, and upon them the State and the Republic rest; and without marriage and its legal maintenance the family circle would be dissolved, the home extinguished, and the State would become useless and the Republic would decline; and in lieu thereof immorality, chaos, and anarchy would reign supreme."

In view of the conclusion we have reached upon the facts stated, it becomes unnecessary to discuss the evidence adduced by the appellees to show that a divorce was in fact obtained in San Francisco before the second marriage.

> *Order appealed from affirmed, costs to be paid*
> *out of the fund in controversy.*