## UNITED STATES FIDELITY & GUARAN-TY CO. v. DOWDLE.  (No. 9332.)

(Court of Civil Appeals of Texas. Dallas. Oct. 11, 1924. Rehearing Denied Jan. 31, 1925.)

**1. Appeal and error ⟨=⟩930(1)—Evidence viewed in light of sustaining verdict of jury.**

On appeal, evidence will be viewed in light of sustaining verdict of jury.

On Motion for Rehearing.

**2. Appeal and error ⟨=⟩218(2)—Statute providing that special verdict shall be conclusive as between parties, construed.**

Rev. St. art. 1986, providing that a special verdict shall, as between parties, be conclusive as to facts found, means that parties to a proceeding in which verdict is rendered on special issues, being dissatisfied therewith, must properly question its validity in court below, and, failing to do this, jury's finding on special issues submitted becomes conclusive as to facts found between parties.

**3. Judgment ⟨=⟩198—Court not authorized in rendering judgment on special verdict to disregard jury's finding on a material issue.**

Trial court is not authorized in rendering judgment on a special verdict to disregard jury's finding on a material issue, even though such finding has no support in testimony.

**4. New trial ⟨=⟩164—Court may set aside jury's findings on special issues as a whole.**

Court may, on motion, set aside jury's findings on special issues as a whole and grant a new trial, but cannot set aside part of them and substitute his own for those set aside and thereon render judgment.

**5. Trial ⟨=⟩350(1)—Statute held only to require trial court to limit submission of a cause to issues raised by pleadings and evidence.**

Vernon's Sayles' Ann. Civ. St. 1914, art. 1984a, only requires trial court to submit and limit submission of a cause on special issues to issues raised by pleadings and evidence.

**6. Trial ⟨=⟩355(1) — Statute held to require evidence to sustain any finding of jury on special issues.**

Rev. St. art. 1985, providing that special verdict must find facts established by evidence and that issue not submitted and not requested shall be demanded as found by court to support judgment, if there is any evidence to sustain such finding, requires that there shall be evidence to sustain any finding of jury on special issues.

**7. Appeal and error ⟨=⟩1175(2)—Power conferred on Courts of Civil Appeals to render judgment which court below should have rendered applies to all judgments.**

Power conferred on Courts of Civil Appeals by Rev. St. art. 1626, to render such judgment as court below should have rendered, applies without limitation to all judgments, whether based on general verdict or jury's findings on special issues, or rendered by court without a jury trial.

**8. Appeal and error ⟨=⟩1175(2)—Where jury's verdict is unsupported and case has been fully developed, Court of Civil Appeals will render such judgment as court below should have rendered.**

Where there is no evidence to support jury's verdict and case has been fully developed, on reversal, Court of Civil Appeals has authority to render such judgment as court below should have rendered, whether judgment is based on jury's findings as a verdict, or a verdict on general submission.

**9. Marriage ⟨=⟩50(5)—Valid common-law marriage not shown to exist where no change of relationship after removal of legal inhibition.**

Valid common-law marriage was not shown to exist by cohabitation and repute, where, at time of entering into same, one of parties was lawfully married, notwithstanding removal of inhibition by divorce, where their relations were thereafter continued without change and without agreement to take each other for husband and wife.

**10. Marriage ⟨=⟩22—Cohabitation and repute do not constitute marriage.**

Cohabitation and repute do not constitute a marriage, but are only evidence, when relationship is not meretricious, tending to raise a presumption of more or less strength according to circumstances.

**11. Marriage ⟨=⟩40(4) — Marriage cannot be presumed from an illicit cohabitation.**

Marriage cannot be presumed from an illicit cohabitation.

**12. Marriage ⟨=⟩40(1)—Courts cannot marry parties by mere presumption without their consent.**

Courts cannot marry parties by mere presumption without their consent, since law compels no one to assume matrimonial status.

**13. Marriage ⟨=⟩18—When marriage status arises, stated.**

Marriage status only arises where parties are not only capable of so contracting, but voluntarily consent to assume, and by mutual contract do assume, such relation.

**14. Marriage ⟨=⟩50(5) — Marriage may be shown by circumstantial evidence.**

Marriage may be shown by circumstantial as well as by direct evidence, and may be inferred from continuous cohabitation and repute when nothing appears to prevent raising of presumption created by proof of such facts.

**15. Marriage ⟨=⟩40(4) — Illicit cohabitation presumed to continue, in absence of proof of change of relation.**

If cohabitation in its inception is illicit, it will be presumed that such relation continues, in absence of proof of change of relation.

**16. Contracts ⟨=⟩10(1)—Contract not mutually binding is void for want of mutuality.**

A contract not mutually binding is void for want of mutuality.

Looney, J., dissenting on motion for rehearing.

⟨=⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Appeal from District Court, Dallas County; Louis -Wilson, Judge.

Proceeding by Mary Dowdle against the United States Fidelity & Guaranty Company before the Industrial Accident Board for an award. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

See, also, 242 S. W. 771; 255 S. W. 388.

Seay, Seay, Malone & Lipscomb, of Dallas, for appellant.

J. W. Craig and John White, both of Dallas, for appellee.

VAUGHAN, J. This is the second appeal of this case. The former appeal was from a judgment in favor of appellant, which was affirmed. See Dowdle v. U. S. Fidelity & Guaranty Co. (Tex. Civ. App.) 242 S. W. 771. Appellant, in said appeal, obtained writ of error, and, on hearing, said judgment of affirmance was reversed and the cause remanded for further proceedings. See Dowdle v. U. S. Fidelity & Guaranty Co. (Tex. Com.. App.) 255 S. W. 388. For statement of the case on the pleadings we refer to and adopt statement made on former appeal. Id., 242 S. W. 771.

The case on the trial from which this appeal is prosecuted was submitted to the jury on one special issue, to wit:

"Do you find and believe from the evidence that there was a common-law marriage between the deceased, Lucius Dowdle, and the plaintiff herein, Mary Dowdle?"

To which the jury answered, "Yes," and on which verdict the trial court rendered judgment in favor of appellee.

The controlling issue presented by this appeal is whether or not appellee was the common-law wife of one Lucius Dowdle at the time of his demise. Therefore, we will only consider the assignments of error and propositions thereunder relating or pertinent thereto, all of which, we think, are comprehended by the following propositions advanced by appellant:

(a) Where a person has a living spouse, such person is incapable of performing a valid common-law marriage.

(b) Where a marriage is once shown to exist, it is presumed to continue until the contrary is shown.

(c) To constitute a valid common-law marriage requires the same good faith as a statutory marriage.

(d) The evidence in this cause shows that appellee did not contract a valid common-law marriage with deceased.

The issue embraced in the first proposition was submitted to the jury by the following portion of the explanatory charge, by which they were to be guided in reaching an answer to the one special issue submitted:

"To constitute such a marriage it requires only the agreement of capable contracting par-ties to become then and thenceforth husband and wife; that such agreement to become husband and wife must be in good faith and of a permanent nature to the extent of that made where marriage is performed in statutory manner. When these elements exist, such a marriage is complete."

[1] In passing upon the questions presented by said propositions, it is necessary to do so in the light of the strongest feature of the evidence sustaining the verdict of the jury. Therefore we have culled from the mass of the evidence and given effect to all portions thereof bearing upon the issue resolved in favor of the appellee by the findings of the jury.

In reference to the contract of marriage alleged to have been made by and between appellee and the deceased, Lucius Dowdle, whereby appellee claims she became and was the common-law wife of said decedent at the time of his demise, appellee testified as follows:

"I knew Lucius Dowdle in his lifetime. I first met him in Queen City, on Lattimer street, where I was living on Joe Greer's place. Queen City is in South Dallas. That was my first acquaintance with him. I had not known him previous to the time he came to my house. I allege in my petition that some time along about that time Lucius Dowdle and myself married. We had been living together at the time he was killed about a year or better. He was there with me, off and on, worked out, going picking cotton; he said he liked me and I liked him all right, and he says he would take care of me and treat me all right, and says, 'Let's me and you marry.' I says, 'All right,' and we just went on like married people. I lived in the same house with him and he supported me, and I worked for him and kept house for him. I waited on him when he was sick. When he mentioned the subject of marriage to me, he just said, 'Lets get married,' and went right ahead. He had been boarding with me before he proposed to marry me about a year. After he proposed to marry me, I accepted him and went to keeping house as husband and wife. During the time I lived with him as his wife, I was loyal and true to him as his wife and, attended to all the duties of the wife in the home. I was living that way with him at the time of his death. At the time I entered into this marriage I was a single woman; I had been single about 18 years. During the two or three years prior to his death I lived and cohabited with him as his wife, slept with him, worked for him, and washed for him. After he had stayed about a year, he says: 'Mrs. Griffin, if you will be married I will help you and be good to you and treat you nice and take care of you, and you won't have to work,' and I told him, 'All right.' "

In reference to the date of the making of this alleged marriage contract and as to her knowledge that deceased, Lucius Dowdle, at that time was legally married to one Callie Dowdle, who was then living, appellee testified:

"I 'aint saying I know that Lucius had a wife named Callie Dowdle; I just heard him talk-

ing about it. I heard he had a wife and a preacher took her away from him; that was all I knew about it; that was after we began living together. He told me before we went to living together, and all during the time we did live together, that he had a wife named Callie Dowdle, and that a preacher took her away from him, and he said about the time we started living together that he believed he would go to San Antonio and clean up on this preacher, and I talked him out of it. He told me about his wife in San Antonio close to where he came from; that he had a wife in San Antonio. I cannot tell you exactly how soon it was after he came there before he commenced to stay in my room. I didn't set any date as to the time he commenced sleeping with me. My judgment about it was the fall of the year some time; it was after Christmas in December, and we just began to go together. That was before Christmas, 1915; I have got my mind on that. It was in the spring or summer of the next year that I learned from him he had another wife; 1916, I think is right. He told me then he had a wife. He got a letter, I don't know·what time it was, but in the spring along after Christmas. The letter stated, 'Just want a divorce.' Never paid any attention to it. He said he had a letter from his wife and she wanted a divorce. I think it was after the time he showed me this letter that we agreed to live together. I had never discussed his wife with him up to the time he got the letter. I didn't know that he had a living wife until he got the letter. I think we had made the agreement to marry at that time, as near as I can remember. We went ahead as soon as he showed me the letter and made the contract. I didn't set any time, but it was after he got the letter, I think. I don't know anything about whether he had gotten a divorce from his wife or not when we made this contract. I don't know whether he got a divorce before his death. I didn't try to find out. I did testify that I had been sleeping with Lucius long before I started playing husband and wife; I don't know whether it was before we agreed to become husband and wife; we just went right on after he signed for the divorce. We went right on living together after he signed for the divorce; it was after that we commenced sleeping together as near as I can remember now."

In our opinion the evidence of appellee, as a whole, is within its own terms so inconsistent and in such diametrical conflict as not to be worthy of being accepted as a guide to the truth of the matters in reference to which appellee testified. This, we think, can apply with almost equal force to the above extracts made from her entire testimony as revealed by the record before us. However, for the purpose of disposing of this appeal, we will assume that the evidence of appellee, the sole witness who testified anent the making of the common-law marriage contract, is sufficient to support the making of such contract in so far as the parties were under the law in position to so contract. The evidence if it reveals with certainty any one thing, establishes that only one marriage contract was made and entered into between appellee and the deceased, Lucius Dowdle. Aided by circumstances, appellee fixed the date of the contract at or about the time that deceased, Lucius Dowdle, received the letter in reference to the suit for divorce that had been filed against him by Callie Dowdle. The nunc pro tunc entry of the judgment rendered in said suit establishes the fact that said suit was filed on the 13th day of October, 1915; that acceptance of service of citation in said cause was made by Lucius Dowdle, the defendant therein, prior to November 22, 1915, for on that date his acceptance of service was filed in the court in which said suit for divorce was pending.

The only marriage contract entered into by appellee with deceased, Lucius Dowdle, was between the dates of October 13 and November 22, 1915, and prior to November 22, 1915; that at the time of the making of same, decedent was the lawful husband of one Callie Dowdle, of which status appellee at that time had notice; that by said nunc pro tunc judgment entry it is shown that on the 22d day of November, 1915, the bonds of matrimony theretofore existing between decedent and Callie Dowdle were dissolved, and from that date to the death of Lucius Dowdle appellee and decedent lived together without contracting to become then and thenceforth husband and wife; that at the time said parties attempted to enter into the marriage state, decedent Dowdle, one of the contracting parties, was under such legal inhibition, to wit, his existing marriage with Callie Dowdle, that he was prevented from contracting a legal marriage with appellee. The fact that said parties continued living together, cohabiting as husband and wife, after the granting of said divorce, is not sufficient to show a marriage in fact after the removal of such impediment; no subsequent contract to enter into said state having been shown to have been made by said parties. Further, the evidence shows that at the time of the commencement of the cohabitation and conduct from which it is sought to establish the fact of the marriage of appellee to deceased Dowdle, there was in fact no marriage because of the inhibition existing to said Dowdle making the contract. Therefore the continuance of such relations after the removal of such inhibition, without an agreement to then and there become husband and wife, would not be sufficient to show a marriage in fact subsequent to the removal of such inhibition, as a continuation thereafter of such relationship, without something more to indicate that there had been a change in the relation of the parties to each other, would not be sufficient to establish the marriage as contended for by appellee. Cuneo v. De Cuneo, 24 Tex. Civ. App. 436, 59 S. W. 284.

No valid agreement creating the relation of husband and wife between appellee and de-

ceased, Dowdle, having been shown to have been made after the removal of the impediment existing to deceased, Dowdle, the cohabitation by said parties thereafter was not as man and wife in continuance of a marriage contract, as "it can of itself be no part of the marriage contract except it take place after and not before the agreement."

We therefore hold that the trial court erred in refusing to instruct the jury to return a verdict in favor of appellant as per its request for peremptory instruction.

As shown by the record, the case has been fully developed, and to remand the cause for further proceedings would serve no useful purpose. Therefore the judgment of the court below is reversed and here rendered in favor of appellant that appellee take nothing by her suit.

Reversed and rendered.

### On Motion for Rehearing.

It is very earnestly insisted by appellee, in a well-prepared and comprehensive motion for rehearing, that, in reversing the judgment of the trial court and rendering judgment for appellant, this court committed error in the following respects:

(1) That, as the judgment of the trial court was entered on the verdict of a jury rendered in response to special issues on which the cause was submitted, this court has neither the jurisdiction nor the power granted to it to reverse and render the judgment.

(2) That, whether or not appellee was the common-law wife of Lucius Dowdle at the time of his demise was purely a question of fact and, as such, was properly submitted to the jury and answered in favor of appellee, thereby, under the law governing special issues, foreclosed that question, there being evidence in support of the findings.

(3) That from the statement of the testimony as set out and recited in the opinion of this court, it is apparent that the said "controlling issue" was abundantly proved, or, if not abundantly proved, that there was ample testimony from which the jury was authorized to conclude and find that the common-law marriage did exist at the time of Dowdle's death, and the findings of the jury on this issue were and are fully sustained by the evidence.

(4) That this court erred in its statement of the law wherein it uses the following language:

"The fact that said parties continued living together, cohabiting as husband and wife, after the granting of said divorce, is not sufficient to show a marriage in fact after the removal of such impediment; no subsequent contract to enter into said state having been shown to have been made by said parties"

—in that, the effect of this language is to preclude an implied agreement and to make appellee's right hinge upon an express contract.

The effect of all other grounds of the motion are embraced in the stated grounds and, therefore, will not be specifically noted.

It is evident from the first ground for rehearing that counsel for appellee are laboring under the impression that a verdict rendered on special issues is clothed with more sanctity by the law than a verdict rendered on a general submission, to wit, that notwithstanding a verdict rendered under a general submission depends for its validity upon evidence to support it, that is, must not be without any evidence upon which the verdict could be based and for want of such evidence may be set aside by an appellate court, and where the cause has been fully developed, proceed to render such judgment as should have been rendered in the court below; that such jurisdiction and authority is not vested where the verdict is the findings upon special issues, and, in support of this contention, cite the following authorities: Article 1986, V. S. T. C. S. 1914; Brown v. City Service Co. (Tex. Com. App.) 245 S. W. 657; Sanger v. Futch (Tex. Civ. App.) 208 S. W. 681.

[2-4] Article 986, supra, provides:

"A special verdict found under the provisions of the two preceding articles shall, as between the parties, be conclusive as to the facts found."

The effect of this statute is that any one of the parties to a proceeding in which the verdict is rendered on special issues, being dissatisfied therewith, must properly question the validity of same in his motion for new trial; or, otherwise, in the court below, and, failing to do this, the finding of the jury in reply to the special issues submitted becomes conclusive of the facts found as between the parties. Robertson v. Kirby, 25 Tex. Civ. App. 518, 61 S. W. 962. And the trial court is not authorized in rendering judgment to disregard the finding of the jury on a material issue, even though such finding has no support whatever in the testimony. Scott v. Farmers & Merchants Natl. Bank (Tex. Civ. App.) 66 S. W. 485. This, because a special verdict, though comprising many findings, is but one verdict and no material parts of it can be set aside for want of evidence to sustain it without setting it all aside. Casey-Swasey v. Manchester Fire Assurance Co., 32 Tex. Civ. App. 158, 73 S. W. 865. However, the trial judge may, on motion, set aside the jury's findings as a whole and grant a new trial, but he cannot set aside part of them and substitute his own for those set aside and thereupon render judgment. Ark. Fert. Co. v. City Nat. Bank (Tex. Civ. App.) 137 S. W. 1179.

[5, 6] Article 1984a, Vernon's Sayles' Ann. Civ. St. 1914, only requires the trial court to submit, and limits the submission of a cause

upon special issues to the issues raised by the pleadings and the evidence in the case, and by the following language of article 1985. Rev. St., it is unmistakably required that there shall be evidence to sustain any finding of a jury on special issues, to wit:

"The special verdict must find the facts established by the evidence, and not the evidence by which they are established. * * * Upon appeal or writ of error, an issue not submitted and not requested by a party to the cause, shall be deemed as found by the court in such manner as to support the judgment; provided, there be evidence to sustain such a finding."

[7] The power and authority conferred by law upon Courts of Civil Appeals by article 1626, Rev. St., when the judgment or decree of the court below shall be reversed, to proceed to render such judgment or decree as the court below should have rendered, except when it is necessary that some matter of fact be ascertained or the damage to be assessed or the matter to be decreed is uncertain, applies with equal force and without limitation to all judgments, whether based upon a general verdict or findings of a jury in response to special issues constituting the verdict, or rendered by a court without a jury trial.

[8] In the case of Sanger v. Futch, supra, the court, in commenting on article 1986, supra, held not to the contrary with the views of this court, to wit, that a special verdict is conclusive between the parties as to the facts found by the jury and should be upheld unless there is no evidence to sustain it; and, further, that the insufficiency of the evidence to support the finding should be directly raised by assignments presented in the brief. Likewise, this court is in accord with the holding in the case of Brown v. City Service Co., supra, to wit, that no authority is given to the trial court or the Court of Civil Appeals in such cases to set aside the verdict of the jury and substitute its own findings instead of the findings of the jury and render judgment according to its own findings. However, this is not in conflict with the generally recognized and applied rule of law that where there is no evidence to support the verdict of the jury, and the case has been fully developed, on being reversed, the Court of Civil Appeals will proceed to render such judgment or decree as the court below should have rendered. This authority is granted and is intended to be exercised only in cases where the verdict is without evidence to support it, and this, whether the judgment is based on special findings of the jury as the verdict or a verdict on general submission.

[9] By proper ground in its motion for new trial, as well as by assignment based thereon contained in its brief, appellant directly challenges the findings of the jury, not only as being contrary to, but without any evidence to support, the particular finding that appellee was the common-law wife of Lucius Dowdle.

Grounds Nos. 2, 3, and 4, supra, being germane to and almost entirely upon the one issue, to wit, whether or not appellee was the common-law wife of Lucius Dowdle, deceased, will be discussed as presenting but one question. Let it be assumed as a fact established that, in so far as it was in the power of appellee and Lucius Dowdle, deceased, they contracted a common-law marriage, and but for the existing impediment to Lucius Dowdle's entering into such status, to wit, his then living wife, Callie Dowdle, by a previous lawful marriage, they would have become in the beginning of their cohabitation husband and wife as at common law, yet such marriage was not consummated by the agreement, acts, and conduct as revealed by the evidence, and could not have been even by the performance between said parties of a statutory marriage so long as said impediment existed; and this, notwithstanding it may be conceded that one of the contracting parties, to wit, appellee, did not know of the existence of said impediment and believed Lucius Dowdle could legally so contract, and in good faith contracted with him for the purpose of becoming husband and wife at common law, and that such relation under those conditions continued up to the removal of such impediment by the dissolution of such prior marriage. Yet it remains that such efforts were up to that time of no avail because of the inability of Lucius Dowdle to contract such marriage. However, if, after the dissolution of said prior marriage, and with a knowledge of the divorce terminating same, appellee and Lucius Dowdle mutually assented to the relation they had theretofore attempted to create, then their marriage was consummated by their subsequent living together and cohabiting as husband and wife. On this most important phase of the case, we find the following facts clearly established by the evidence:

Lucius Dowdle, prior to and at the time he and appellee agreed to get married as testified to by appellee, was married to one Callie Dowdle, who was then living and from whom he had not been divorced. That appellee did not have any knowledge of the granting of the divorce between Lucius Dowdle and his former wife, Callie Dowdle, and that whatever agreement they may have made, and whatever relations they sustained one to the other, was not after they had acquired any knowledge of the granting of the divorce or in reference to the effect thereof, is clearly established by the following extract from appellee's testimony:

"I don't know anything about whether he had gotten a divorce from this wife or not when he made this contract. I don't know whether he

got a divorce before his death. I didn't try to find out."

Callie and Lucius Dowdle were divorced by decree of date November 23, 1915, rendered in cause styled, "Callie Dowdle v. Lucius Dowdle, No. B–10856, in the district court of Bexar county." Lucius Dowdle died on the 5th day of February, 1918. That during the period of time, to wit, the date of the decree granting the divorce, to the death of Lucius Dowdle, neither appellee nor Lucius Dowdle had any knowledge of the granting of said decree annulling the marriage theretofore existing between Lucius Dowdle and Callie Dowdle, and that appellee and Lucius Dowdle did not during such period of time, with the knowledge of such decree, mutually reassume and assent to the marriage estate between them, and their living and cohabiting together as man and wife after the date of said decree was not with a knowledge of or in view of the effect of the granting of said divorce. Until after the granting of the divorce in the suit instituted by Callie Dowdle against Lucius Dowdle, and knowledge of the change thereby produced in his status brought home to appellee and Lucius Dowdle, no occasion could have arisen for them to have attempted to adjust their illegal relation so as to become husband and wife after the removal of the impediment that prevented them from lawfully assuming that estate. That such unlawful relation continued until the removal of said impediment must be conceded, and thereafter undoubtedly continued unless, with a knowledge of such removal, they mutually reassumed and assented to the relation of husband and wife. The relation of appellee and Lucius Dowdle prior to the time he was divorced from Callie Dowdle was, as to Lucius Dowdle, criminal, and so continued thereafter up to his death; appellee and Lucius Dowdle not having, with a knowledge of the decree of divorce dissolving the bonds of matrimony between Lucius Dowdle and Callie Dowdle, mutually reassumed and assented to the relation between them so as to make valid that which was in its origin illegal and void. For, regardless of what they may have agreed to, or their acts and conduct for the purpose and with the intention of becoming husband and wife after the granting of the divorce removing the impediment existing as to Lucius Dowdle, unless same occurred with the knowledge and in view of the effect of the granting of said divorce, their original illegal relation could not thereby be and was not transformed into a valid marriage at common law. Cartwright v. McGown, 121 Ill. 388, 12 N. E. 737, 2 Am. St. Rep. 105.

In the instant case the evidence excludes any presumption of the death of the first wife of Lucius, she being alive after his death, and there can be no presumption that she obtained a divorce before his attempted marriage with appellee, as the evidence shows the divorce was not granted until November 22, 1915, and the established facts will not justify the presumption that he procured a divorce from Callie Dowdle prior to his assumed marriage with appellee.

The facts in the instant case being so similar to the facts in the Cartwright-McGown Case, supra, in the further discussion the language of the opinion in that case will be largely paraphrased.

[10-12] The evidence in the record is amply sufficient to show that Lucius Dowdle and appellee lived and cohabited as husband and wife and that during all this time he treated her as a man would a wife; but it must be borne in mind that cohabitation and repute do not constitute a marriage, but are only evidence tending to raise a presumption of more or less strength according to the circumstances of the case, and that the cohabitation must not be made meretricious but matrimonial in order to give rise to this presumption. If this evidence was as to cohabitation and repute from some date after and with a knowledge of the divorce granted at the suit of Callie Dowdle, when no impediment existed, it might afford evidence of a common-law marriage of appellee and Lucius Dowdle by their own acts. All of the cohabitation and repute that was the result of the assumed marriage status prior to the granting of the divorce was illicit and not matrimonial, and no marriage can be presumed from such relation. Their cohabitation being meretricious in its inception, at least in so far as Lucius Dowdle was concerned, was it changed by said divorce and rendered thereafter matrimonial? This would seem to depend upon the intention of the parties and the fact whether they had knowledge of the divorce removing the only impediment there was to their marriage. There is no proof in the record that either Lucius Dowdle or appellee had ever been informed of the divorce. Without knowledge of the removal of the impediment, they could not have intended a second marriage or have attempted to enter into another marriage. Notwithstanding the policy of the law to indulge any reasonable presumption in favor of innocence and against immorality and guilt, the law has never gone so far as to force the status of marriage upon citizens contrary to the facts revealing the true relation occupied by the parties. Courts cannot marry parties by mere presumption without their consent. In the absence of consent, the status of marriage is never created by any government. The law compels no one to assume the matrimonial status. Without assent, no statute or constitution can create this relation.

Dickerson et al. v. Brown, 49 Miss. 357. In that case the plaintiffs contended that the following constitutional provision, immediately on adoption, to wit, "All persons who

have not been married, but are now living together, cohabiting as husband and wife, shall be taken and held, for all purposes in law, as married, and their children, whether born before or after the ratification of this constitution, shall be legitimate; and the Legislature may, by law, punish adultery and concubinage" (Const. of Miss. art. 12, § 22), created for the parties embraced within its provisions the relation of husband and wife ipso facto without any assent thereafter given by them to the effect of such amendment. Disposing of this contention, the court held:

"The state, says Bishop, will cause its citizens to assume the matrimonial status only where they consent to assume it. * * * 'We have seen in the foregoing discussions that through all the law of marriage, runs the principle which puts it in the power of parties to assume or not, at their own election, the marriage status, while the status is imposed upon no one who does not accept it voluntarily.' * * * Indeed, no marriage is valid without consent, however consummated. * * * Consent is the essence of marriage, without which it cannot exist. * * * In the absence of consent, the status of marriage is never superinduced by any government. * * * The law compels no one to assume the matrimonial status, because marriage requires for its constitution the mutual consent of the parties, which consent is the contract. * * * The conclusion is, that if these parties [referring to parties alleged to have lived together and cohabited as husband and wife without having been married] were 'cohabiting as husband and wife,' at the time of the adoption of the present Constitution, and if, with a knowledge of its provisions, they mutually assented to the relation, then their marriage was consummated and their children legitimated. The question involved thus becomes one of fact to be determined accordingly."

[13] Thus it is made clear that the marriage status can only arise where the parties are not only capable of so contracting, but must voluntarily consent to assume, and by mutual contract do assume, that relation and that same cannot arise from any mandate of the law.

To the same effect is the holding in the case of Floyd v. Calvert, 53 Miss. 37, to wit:

"Where a person claims to be married, under section 22, art. 12, of the state Constitution, there must be shown some formal and explicit agreement between the parties that they will and do accept the new organic law as establishing thenceforward between them a new relationship, or there must be such open and visible change in the conduct and declarations of the parties, that an agreement to accept the new law might fairly be inferred."

When parties are living in a meretricious state, under a promise or agreement that they will at some future time marry so as to become in fact husband and wife, does not effect a marriage by a mere continuance of their association or connection. What evidence is there that Lucius Dowdle ever consented to, or even desired, to change his connection with appellee from an illicit to a matrimonial one after removal of the impediment which was a barrier preventing him from entering into that estate, and which prevented appellee from becoming his wife? He took no steps to remove the impediment to his marriage with her; the divorce was not sought by him, but was obtained by Callie Dowdle, his former wife. If he had no knowledge of this divorce, it cannot be presumed that he would have married the same woman. If he had notice of the divorce and desired to change his illegal relationship with appellee into that of marriage, it was an easy matter for him to have solemnized a legal marriage, or for the parties in some proper manner, with a knowledge of the granting of said divorce, and having in mind the effect of same, to have indicated an intention to enter into such relation. But this was never attempted with the knowledge of and in the light of the effect of the divorce granted at the suit of Callie Dowdle. It may be said that the holding of appellee out to the world as his wife after the divorce had been granted, although without the knowledge thereof, showed a desire to change his connection with her to that of marriage. But little importance can be attached to this circumstance when considered in connection with the other facts of the case. Especially that no testimony was introduced tending to show that Lucius Dowdle held appellee out to the world as his wife other than on the occasion when they were hailed before the council of the colored Baptist Church, when it became necessary to make such an admission under pain of expulsion from the church, and on other occasions when he made half-hearted admissions to relatives of appellee and when he joked about his relations to the witness Wade. The holding of appellee out as his wife before the divorce was a fraud and a deception, and, if Lucius would attempt to deceive the public by creating false appearances after he was hailed before the council of his church, why may not his subsequent acts also have been equally deceptious and fallacious?

In this connection it is well to bear in mind that a concubine is often held out to the world as a wife to conceal an illicit cohabitation and prevent a criminal prosecution; and, in addition to this, if Lucius had desired to change his former connection with appellee, there was an easy way open to him, and that a court, even if he were living, could not decide and act for him.

[14-16] If appellee knew of the prior marriage of Lucius Dowdle, then her cohabitation with Lucius was meretricious in its inception and could only be changed after the disability of Lucius was removed with the knowledge of such removal and then only by

the mutual consent of both. If appellee had notice of the illegality of her marriage after the removal of such disability, and cohabited with Lucius after that without a new marriage, it was criminal. If she desired to make her subsequent connection with him lawful, she no doubt would have insisted upon a proper or statutory marriage so as to preserve the evidence of the same. Marriage, it is true, may be shown by circumstantial as well as by direct evidence. It may in a proper case be inferred from continuous cohabitation and repute when nothing appears to prevent the raising of the presumption created by the proof of these facts. If the cohabitation was in its inception illicit, the presumption of the innocence and morality of the parties is at once rebutted and overcome, and without proof of a change in their relations to each other, it will be presumed that this continuance of the connection of the parties is of the same character. Even assuming that appellee had no knowledge of the invalidity of her marriage with Lucius Dowdle, and therefore the cohabitation on her part was not criminal, that would not validate the assumed marriage even as to her. If valid as to her, it must be equally so as to him. A contract not mutually binding is void for want of mutuality. Under such circumstances, it could only be said that appellee was not liable for criminal punishment for living with a man she supposed in good faith was her husband. That the union between appellee and Lucius was at first illegal cannot be questioned. If a change occurred, it was followed by no formal celebration, nor is there evidence of any present agreement made by them after and with knowledge of the decree divorcing Lucius and Callie to take each other for husband and wife, and that they ever passed by contract or by mutual consent from their unlawful status to that of legal marriage.

Here the evidence establishes with sufficient certainty that in its inception the relation between appellee and Lucius Dowdle was illicit, and there is no sufficient evidence to create a legal presumption of any subsequent marriage.

Not as a direct and positive authority, but as supporting generally the application of the rules of law applied to the material facts herein discussed, we cite the cases of Grigsby v. Reib et al., 105 Tex. 597, 153 S. W. 1124, Ann. Cas. 1915C, 1011; and Berger v. Kirby, Adm'r, et al., 105 Tex. 611, 153 S. W. 1130, 51 L. R. A. (N. S.) 182.

The particular phase of this case here discussed was not presented to or in any measure reviewed by the Commission of Appeals in its opinion rendered in the case of Mary Dowdle v. U. S. Fidelity & Guaranty Co. (Tex. Com. App.) 255 S. W. 388. Therefore, was not embraced in the statement in that opinion, viz:

"The evidence in this case raises an issue of fact as to whether, at the time of the death of the deceased, plaintiff in error was his common law wife, and should this case be again tried before a jury on similar facts this issue should be submitted."

Therefore we are not in conflict with that holding in the conclusion we have reached on this appeal. The above material facts given proper legal effect, the findings of the jury that appellee was the common-law wife of Lucius is contrary to the evidence or without any evidence in its support.

The motion for rehearing is overruled.

LOONEY, J. (dissenting on motion for rehearing). I find myself at variance with the majority of the court on the law of this case. At a former day, the court reversed and rendered the cause in favor of appellant. I agreed to that disposition of the case at the time, but on careful reconsideration I cannot escape the conviction that the court committed error. I will state the grounds of my dissent.

The action of the majority is bottomed on the idea that the evidence is insufficient to raise the issue of the existence of a common-law marriage between Mary Dowdle, appellee, and Lucius Dowdle at the time of his death in February, 1918; that the union of appellee and Lucius was in its inception illegal and the evidence failed to show a valid agreement by the parties creating the relation of husband and wife, entered into after, and with a knowledge of, the removal of the impediment to their marriage, that is, after Lucius was divorced from Callie, his first wife; that their cohabitation was meretricious and not a continuance of an agreement of marriage, and therefore the court below should have peremptorily instructed a verdict for appellant.

The material facts of the case may be gleaned from the opinions of Mr. VAUGHAN, Associate Justice, supplemented by the following:

Nellie Griffin, a daughter-in-law of appellee, testified that in the fall of 1915 she resided at Ferris, Tex.; that Lucius Dowdle came to her house during the month of December of that year and remained there, picking cotton, and at that time said he and Mary were married; that she wrote letters for him, addressed to appellee as "Mary Dowdle," signed, from her "husband, Lucius Dowdle," in which he sent money to Mary; that Lucius came to her house again in the fall of 1917, and at that time she wrote letters for him to Mary the same as she did in the fall of 1915, in which money was sent as before. Witness testified that Lucius and Mary lived together, were out in company together, acted like man and wife; that Lucius introduced Mary as his wife, and heard him tell his friends that she was his wife.

When witness returned to Dallas after being told in December, 1915, by Lucius that he and Mary were married, she congratulated Aunt Mary on the fact of her marriage, and Aunt Mary also said they were married.

J. S. Wade, son-in-law of appellee, testified that deceased told him about November, 1915, that he and appellee were married; that he intended to buy a home and take care of Mary as man and wife ought to do. He referred to her as his wife, looked after her, bought groceries, paid house rent, and such like. Witness testified, further, that he read the letters from deceased, written to appellee by Nellie Griffin, in which money was sent, and that he answered the letters for appellee. The letters received by Mary were signed, "Lucius Dowdle," addressed to his wife, "Mary Dowdle."

Flora McDade, daughter of appellee, testified that deceased came to her mother's house the first part of the year 1915; that he told witness in December, 1915, that he and her mother were married. Witness testified that they lived together in 1915, 1916, 1917, and 1918.

John Thomas, deacon of the church to which Lucius and Mary belonged, testified that Mary's name was put on the church books, "Mary Dowdle," but witness did not know when it was thus entered; heard Lucius introduce her as Mary Dowdle; white people for whom Mary washed and ironed called her by that name. There arose in the church a squabble about Lucius and Mary living together, and the matter was investigated. In answer to the question that arose, Lucius stated that Mary was his lawful wife, and Mary also said that they were married and had been three or four years. The matter was then dropped.

In regard to the divorce proceedings between Callie Dowdle, first wife of deceased, and the knowledge of appellee and deceased with reference thereto, the following evidence is pertinent: The court proceedings in evidence show that Callie Dowdle was granted a divorce from Lucius Dowdle by the district court of Bexar county, Tex.; that the suit was filed October 13, 1915, and on November 22, 1915, a waiver of service, properly executed and signed by Lucius, was filed in said cause, and, on same day, the case was tried and divorce granted.

Appellee testified:

"* * * Lucius Dowdle did not say he had divorced any other wife—she had wrote to him for a divorce. * * * We were going right ahead after * * * he signed the divorce because he said she (Callie) was going to get married to that preacher. * * * He got a letter, I don't know what time it was, but in the spring, along after Christmas. The letter stated, 'Just want a divorce.' Never paid any attention to it. He said he had a letter from his wife and she wanted a divorce. I guess he gave her the divorce. I never knew her. I think it was after the time he showed me this letter that we agreed to live together. I have forgotten. I had never discussed his wife with him up to the time he got the letter. I didn't know he had a living wife until he got the letter. Up to that time we were going along, talking. I think we had made the agreement to marry at that time, as near as I can remember. * * * We went ahead as soon as he showed me the letter and made a contract. * * * I don't know anything about whether he had gotten a divorce from his wife or not when we made this contract. I don't know whether he got a divorce before his death. I didn't try to find out. I never went to San Antonio; he went."

My interpretation of this evidence is that the relation of these negroes in its beginning was illegal, because Lucius was married to another woman and could not legally marry appellee. Their relation may also have been meretricious and not matrimonial in intent, yet it reasonably appears from the evidence that, either at the beginning, or soon thereafter, Lucius and Mary agreed to live together as husband and wife and thereafter recognized and held each other out as such and were thus recognized by relatives, friends, and the church of which they were members; that this relation continued, constant and unequivocal, without hiatus, from its beginning in 1915 in February, 1918.

After Lucius was divorced from his first wife in November, 1915, the impediment to the legal marriage between him and appellee was removed. The parties were then competent to consummate a legal marriage, and it is not, in my judgment, a controlling fact that a formal marriage agreement between the parties was not shown to have been entered into after the impediment was removed, nor do I believe it can be said, as a matter of law, that the cohabitation of the parties under the circumstances, although in ignorance of the divorce, was fatal to the existence of a valid common-law marriage.

The right to enter the marriage relation without license or ceremony, as at common law, is recognized in this state. Consent, and a living together of the parties in the relation of husband and wife, will, in the absence of a legal impediment, consummate marriage.

On the first appeal of this case, judgment in favor of the guaranty company, rendered on an instructed verdict, was affirmed by this court (Dowdle v. U. S. Fidelity & Guaranty Co. [Tex. Civ. App.] 242 S. W. 771), but was reversed and the cause remanded by the Supreme Court adopting the report of the Commission of Appeals (Dowdle v. U. S. Fidelity & Guaranty Co. [Com. App.] 255 S. W. 388).

The evidence bearing on the marriage relation before the court on the former appeal was not materially different from the facts

now under consideration. The Commission of Appeals, in recommending that the case be remanded for a new trial, among other things said:

"In our opinion the evidence in this case raises an issue of fact as to whether, at the time of the death of the deceased, plaintiff in error was his common-law wife, and should this case be again tried before a jury on similar facts this issue should be submitted." 255 S. W. 389.

Although the jury may have believed that the relation of these negroes in its origin was illegal, in that Lucius Dowdle then had a living wife, or they may have believed that their relation was consciously meretricious on the part of both, yet, in my opinion, they were authorized from the facts and circumstances to find that after the impediment to their marriage was removed by the divorce decree, they agreed to become husband and wife or that they ratified a former ineffectual agreement entered into for that purpose. Their living together consistently, their treatment of each other, the holding out of each other as husband and wife, the fact that they were thus regarded by their relatives and friends, are facts entirely consistent with and support the idea of an existing common-law marriage.

The courts of the country are by no means harmonious on this subject. Decisions can be found that support the rule applied by the majority, but, in my opinion, the more liberal and, as I respectfully submit, the more reasonable rule is supported by decisions from our own, as well as by the best considered cases from other courts.

In the very early case of Yates v. Houston, 3 Tex. 433, the question presented was whether a relation of this kind, illicit in its origin, was shown to have been changed to a matrimonial status. The court said, among other things:

"But admitting that their original intercourse was illicit with the knowledge of both parties, it would be urging the presumption to an unreasonable extent, to suppose that the unlawful character of the connection was unsusceptible of change, and that when all legal disabilities had ceased to operate, they would voluntarily decline all the honors, advantages and rights of the matrimony, and prefer an association disgraceful to both parties." 3 Tex. 450.

In the case of Edelstein v. Brown (Tex. Civ. App.) 95 S. W. 1126, the relation of the parties in its beginning was meretricious. In reviewing that case, this court said:

"Notwithstanding the intercourse between appellant and the mother of the appellees prior to her divorce was illicit, yet the evidence was sufficient to justify the jury in finding that they, immediately upon the granting of the divorce, repented of their sinful course and agreed to become husband and wife, and were so held out each by the other, and were so regarded by their neighbors and friends, and in law were husband and wife."

Numerous authorities were cited. This case was affirmed by the Supreme Court in 100 Tex. 404, 100 S. W. 129.

The doctrine of these cases finds abundant support: Bounds v. Foster, 36 Tex. 68; U. S. v. Hays, 20 F. 710; Davis v. Whitlock, 90 S. C. 233, 73 S. E. 171, Ann. Cas. 1913D, 538, and note, pages 544–548; Becker v. Becker, 153 Wis. 226, 140 N. W. 1082, L. R. A. 1915E, 72–87; People v. Shaw, 259 Ill. 544, 102 N. E. 1031, L. R. A. 1915E, 91–108; 18 R. C. L. § 46, p. 421.

The evidence relating to the divorce decree and the knowledge of appellee and deceased, in regard to the divorce, has heretofore been set out. The majority opinion on rehearing stresses the idea that, although the evidence in the record is sufficient to show that Lucius and Mary lived and cohabited as husband and wife, and that he treated her as a man would his wife, yet this would not evidence the existence of the marriage relation between them unless it was shown that they knew the divorce had removed the impediment to their marriage. In other words although the divorce decree had in fact removed the only impediment to a legal marriage between them, that their living together thereafter as husband and wife would not constitute marriage unless they knew the impediment had been in fact removed.

In my opinion, this rule is too rigid and runs counter to a sound public policy, in this: We are dealing with the marital relation, which, while based upon the assent of parties, is a social status in which society at large is vitally concerned. This status is imposed wherever the parties agree to be married, as evidenced by license and ceremony, or, in the absence of license and ceremony, where their conduct and repute are matrimonial, consent may, and should be, presumed. Society confers certain rights, privileges, and exemptions on married persons that are withheld from persons living in a state of celibacy, and, conversely, obligations, duties, and responsibilities are imposed on them from which the celibates escape. The consequences that flow from the marriage relation lie at the foundation of civil government, and are of such fundamental importance to society that the relation should not be left in doubt. Therefore, where the parties consent, as evidenced by license and ceremony, or where the conduct and repute of the parties are matrimonial, where the living together and holding out as husband and wife are unequivocal and constant, it should be presumed that the parties interchanged consent to be married.

From a review of the evidence, the jury may have concluded that Lucius and Mary knew of the removal of the impediment to their marriage. The divorce decree, itself, recites that Lucius, the defendant, signed a waiver of service in the case, therefore he

knew such a suit had been instituted; besides he made a trip to San Antonio. Appellee in her testimony speaks of a letter that was written to Lucius by Callie, his first wife, in which she wanted a divorce. She said she guessed Lucius gave her (Callie) the divorce; did not know whether the divorce was granted or not; did not try to find out; did not go to San Antonio, but that Lucius did go.

In Manning v. Spurck, 199 Ill. 447, 65 N. E. 344, the court said:

"It is probably a safe rule to say that if parties to a marriage, in the beginning, desire and intend marriage in good faith, as a matter of fact, but an impediment exists, and the desire and intention continue after the impediment is removed, and the parties ·continue in the relation of husband and wife, and cohabit as such, it is sufficient proof of a marriage."

In Townsend v. Van Buskirk, 33 Misc. Rep. 287, 68 N. Y. S. 512, the court said:

"There can be no other conclusion from all the evidence in the case than · that she and Townsend desired marriage, that that was their intention, and consequently 'their cohabitation, thus matrimonially meant,' made 'them husband and wife from the moment when the disability' on his part was removed, and it was immaterial whether he knew of that removal, * * * the fact being that it was removed, and their consent to the matrimonial relation may be inferred from their acts and conduct."

In a Nebraska case, Eaton v. Eaton, 66 Neb. 676, 92 N. W. 995, 60 L. R. A. 605, 1 Ann. Cas. 199, the court, in reversing a judgment of the lower court which held a marriage void said:

"If the parties live together, and intend to sustain towards each other the relation of husband and·wife,·they are, in the· absence of any impediment fatal to that relationship, legally married. The marriage between the plaintiff and defendant was an 'attempt made in good faith to form a legal union. Both intended to live in wedlock. In the absence of an impediment to the marriage, no ceremony would have been required; the mutual consent of the parties would have been sufficient. When the impediment was removed, why may not consent be inferred from continued cohabitation?"

It will also be noted that the courts of Great Britain, from whom we inherited the common law, place the same construction upon its principles in the respect here under discussion. In 1867 the case of Campbell v. Campbell, reported in L. R. 1 H. L. 182, was before the House of Lords. The facts were that Campbell eloped to Canada with the wife of one Ludlow, where they lived together as husband and wife until after the death of Ludlow, of which fact, however, the parties were ignorant. They returned to England and, after the birth of a son, settled in Scotland, where they thereafter continued to live together as husband and wife. Thus it appears that their union in its origin was not only illegal, but flagrantly meretricious; that the legal ·impediment to their marriage was at some time during their cohabitation removed by the death of Ludlow, but of this they seem to have been entirely ignorant. However, from the inception of their relation to the end they held .themselves out, uniformly, as man and wife. The contention was made that the presumption arising from their subsequent· conduct must be referred to the original illicit relationship, and that no presumption could arise that they interchanged consent to marry after the impediment was in fact removed. Lord Westbury denied this contention in the following language:

"I should undoubtedly oppose to that (the contention mentioned above) another and, I think, a sounder rule and principle of law, to wit, that you must infer consent to have been given at the first moment when you find the parties able to enter into the contract."

In 1876· the same question was before the House of Lords in the case of De Thoren v. Attorney General, reported in L. R. 1 App. Cas. 868. In this case the parties attempted to consummate marriage, which was void because of the existence of a legal impediment; but they continued to live together as husband and wife after the removal of the impediment, of which, however, they were ignorant. It was contended that the inference of marriage was rebutted because the parties commenced their living together in pursuance of an invalid marriage, and that the consent deducible from cohabitation must relate back to their ineffectual attempt to get married. This contention was denied. It was held by the court that the inference of an interchange of matrimonial consent took place as soon as the parties were enabled by the removal of the impediment to enter into a marriage contract. Lord Chelmsford said:

"Taking the facts as they are stated in the case and applying the law to them, the Court of Sessions is of opinion that, assuming the ignorance of the parties of the invalidity of the ceremony of marriage during the whole period of their cohabitation, yet, after the removal of the impediment to their marriage and before the birth of their eldest son, they became married persons."

Under the doctrine announced in these cases, the trial court, in my opinion, was well within his duty in requiring the jury to find from the evidence whether or not there existed a common-law marriage between Lucius and Mary, and the jury, in response to the submission, having found that that relation did exist, their finding, in my judgment, was justified.

The largest fact in the case, in truth its background, without which we are unable to justly appraise the value of the evidence, is that these parties were just ordinary, un-

lettered negroes of a familiar type in this country. The courts judicially know the degree of moral development attained by them, their loose ideas of social obligations, and that they are not yet conscious of the sanctity and beauty of the marital relation as expressed by an eminent writer, who said:

"Though fools spurn Hymen's gentle powers,
We who improve his golden hours,
　　By sweet experience, know
That marriage, rightly understood,
Gives to the tender and the good,
　　A Paradise below."

Nevertheless, after the beginning of their union, although in an irregular and unconventional manner, it nowhere appears that Lucius and Aunt Mary were thereafter disobedient to the obligations of the relation assumed by them.

I submit, therefore, if any presumptions are to be indulged from the evidence in this case, they should lean to innocence rather than to guilt, and should support a status of matrimony rather than a status of concubinage.

I am of the opinion that the motion of appellee for a rehearing should have been granted, and that the judgment of the trial court should have been affirmed.